Thank you, Judge Rollinson, and good morning, Your Honors. Ryan Frazer of Baynard Katzman Littrell Williams on behalf of Appellants Day Young Lee and 940 Hill LLC. I would like to reserve three minutes for rebuttal and remind the Court. May it please the Court. Restricting speech activity without meaningful scrutiny violates the Constitution. We're here because that's exactly what happened below. The District Court restrained the appellants and their attorneys' First Amendment speech rights without findings of fact, without a legal test, without any reasoning at all. Under Levine... And how did the Court do that? How did the Court restrict the speech without findings of fact, in your view? The District Court's words were, I'm not going to allow it for either side. Any other issues with respect to jurisdiction? Oh, so you're talking about the social media? Yes, Your Honor. Okay. Yes. For a minute I thought we had the wrong case. I'm not. All right, so we're talking about jurisdiction. But it was not it was not objected to on those grounds. The District Court really would have no notice that there could have been even a First Amendment issue. Of course the defense did object to imposition of the ban and the District Court's hasty ruling precluded an opportunity to specify a First Amendment ground. So it's my position that the First Amendment error is preserved. What would have been the First Amendment articulated? There is a, so under Packingham, cyberspace and social media in particular are the most important place for the exchange of views under the First Amendment. What about, what authority have you got for jury selection in particular? It's a very special routine, as you know, and there's an awful lot of discretion about how courts go about doing that. So what support have you got for this argument that he was entitled to use social media? As this court stated it well and the Supreme Court has used the same phrase, trial participants do not shed their constitutional rights at the courthouse door. And the, so... Does that mean you don't have any authority that speaks to jury selection? I do not have an authority that that said that refers to internet access rights during jury selection. I'm not trying to give you a hard time, but I do need it to be specific because if I do not want to miss anything here. So your strongest argument for the, on the First Amendment point is what exactly? The defendants and their attorneys had a right to access the internet that could not be restricted without application of a meaningful form of scrutiny. Under Levine, that would be a test, it's a three-part test. It would be that the activity to be restricted had to pose a substantial threat to protected activity. The restriction would have to be narrowly drawn and there would have to be no alternative that's no less restrictive. There were pre-trial conferences proceedings, I think a pre-trial order, a pre-trial conference discussing how jury selection was going to happen. And my read of the record is that this was a surprise to the trial court judge on the morning of jury selection. Do I misread it? No, Your Honor. However, there was no duty on behalf of defense counsel to flag this issue. The government itself... It's quite a curveball though. It's quite a curveball. And a trial court judge has a lot of things going on in the morning to start a jury trial. So... It's a curveball that the government created by making the motion to impose this ban. Notably, in the Trump case in the D.C. proceedings, the government filed a brief taking the position that it is counsel's duty, unless prohibited by a court order, to conduct social media research on jurors. But I... Why wouldn't that make it less problematic under the freedom of speech rather than more problematic? It was an even-handed courtroom management issue where typically the courtroom and jury the district court was never given notice that there was a free speech issue. Even-handedly managing the courtroom. There's all sorts of courtroom management decisions that district court judges do that affects speech incidentally that we wouldn't give a second glance to under the First Amendment. The district court... So good... The court, of course, is raising a good point. The district court can impose a restriction on social media research in some cases. My position is that if that's going to be done, it has to be done by applying intermediate scrutiny. Not strict scrutiny, because trial participants don't have the same First Amendment rights that the public does. Why wouldn't this be invited error? Or... I mean... You're saying it's not plain error, but you're... It is a practice, apparently well-known throughout the districts of this circuit, to reach agreements with respect to social media as well as district courts elsewhere. But you didn't do that. No, the government wanted to ban social media research and the defense objected and asserted its right to conduct that research. So there's certainly no error invited by the defense in this case. The defense objected to imposition of the ban. So your view of the record is that they're just... The defense didn't raise this. There was... Before the day of trial, jury selection was discussed about how this was going to be conducted. It wasn't raised. Not that you said you weren't going to do it. You just didn't raise it. And then on the morning of trial, the government is the one that raised the motion. That's correct. The government... I think the transcript suggests that the government was under the impression that the defense was planning to do this. Yes, and that's the reason that the government moved to impose the ban. Okay. But citing no facts specific to this case. And similarly, the district court didn't cite a single fact at all in support of imposing the ban. And that's the crux of the problem. First Amendment restrictions require some of the most careful reasoning by courts to impose them or to uphold them. And here, there's just no reasoning at all. Thank you. I'm wondering if you could turn to the... I'm interested in your hearsay objections regarding the recorded conversation. Yes, Your Honor. This was... So, focusing first on excluded Exhibit 118A, Mr. Lee's questions were asked in this surreptitiously recorded conversation with the government lead witness, cooperating witness. And the core error committed by the district court in excluding that evidence is its failure to focus on the evidence of what Mr. Lee intended when he asked those questions. But doesn't that... Doesn't that all pivot on whether we read these as actual questions as opposed to assertions? Yes. Yes. But the issue there is not whether there is an unstated fact underlying the question, but what Mr. Lee intended to do when he uttered the question. If he intended to assert a fact, such as asking a rhetorical question, then that would be... That's a statement under the hearsay rule that could properly be excluded. But that is not what the evidence in this case shows that Mr. Lee was trying to do when he asked this question. Can you tell me specifically, I've got the transcript right here, which parts of it were excluded that you think you're entitled to? So, in Exhibit 118A, who took the money? Did George take it all? How much was given to the union? Those are questions that Mr. Lee asks intending to elicit information from Justin Kim. And because they're inquisitive questions, not rhetorical questions, they're not statements in the first place and can't be excluded as hearsay. We pointed out in our briefing, and the government hasn't offered any competing interpretation. Part of what shows the lack of assertive intent here is take into account a fact that the government highlighted in its closing, which is these were surreptitious recordings. Mr. Lee didn't know he was being recorded, which is part of what makes the evidence so important to the defense. But also, both parties to this conversation, that is Mr. Lee and Mr. Lee, as between them, only Kim knew what he'd actually done with this money. And so that's where I think the responses from Justin Kim are so telling. He doesn't say something like, oh, okay, I see your plan there and what you're trying to get at. You're gonna say you don't know what happened to the money. Instead, he just answers the questions as earnest questions, because that's how he understood them. And that's very important for the jury to have understood that this same witness who's interpreting these recordings, which were the heart of the government's case, to be, in essence, a confession to the charges, is a guy who's responding to these inquisitive questions from Mr. Lee earnestly, indicating that even he understood. In fact, Mr. Lee didn't know what happened to his money. And that goes to the heart of the defense. So it's the government's burden to show the exclusion harmless. But in this case, I think the harm is very severe. And we would even be able to carry a burden of showing the harm, given the centrality of this evidence to the government's arguments. It goes to the heart of the defense, but it would be presented in a form that would preclude cross-examination of the statements. Well, I mean, insofar as, you know, Mr. Lee couldn't be compelled to take the stand. But there's no unfairness to the government there, because the government created this conversation between Justin Kim and Mr. Lee, and the government played extensive portions of the recording and cherry-picked from them and had Justin Kim interpret them as a confession to bribery. So, you know, the defense is just looking for an opportunity here, even if it were hearsay. And that's another facet of the error of the exclusion is the rule of completeness. Even if it were hearsay, which it's not for the reasons argued, it's necessary context for the jury to understand the portions of the recordings that the government relied on so heavily. Is this reviewed for an abuse of discretion? Yes, it is reviewed for an abuse of discretion. But I think what, in an abuse of discretion framework, the initial step is to confirm that the court applied the correct legal rule. And here, the operative legal rule in the hearsay ruling is to look to whether the questions were intended assertively. That's in the advisory committee note to rule 801. And it's actually the government's burden to show assertive intent in order to exclude the questions as hearsay. But even at that level, it seems to me there was pretty powerful evidence for the court to conclude that perhaps Mr. Lee did suspect that he was being recorded. A lot had happened as of the time of this conversation in the restaurant. I think that, you know, the portions of the recording that the government focused on, the government selected those portions because the government sees them as being strong support for the government's case. So it wasn't there. Forgive me for interrupting, but I was making a different point. And that is that I think your premise is that these were assertions as opposed to that there wasn't room to doubt the veracity of them as legitimate assertions or honest, legitimate questions. And it seems to me, given the chronology of where this conversation took place, the district court did have reason to doubt that. So I just putting that out there for you so you can tell me why you think I'm wrong. So my position is not that there that the issue is not veracity, but looking to Mr. Lee's intent when he poses that veracity. That is, I beg to differ. I what I'm saying, if I'm not suggesting a credibility determination, I'm suggesting that the court had this transcript. I'm responding to your statement that these are assertions were there. If I said that I apologize, Your Honor, if I said that his questions were assertions, that's that's basically the opposite of what I'm trying to get at. The judge had a reason to think that these were not legitimate questions. That's my I'm giving you a chance to respond to that. I think your premise is that Mr Lee did not know he was being recorded and didn't have a reason to suspect that, sir. And what I'm suggesting is that, given the timeline here, it seems to me that Mr Lee probably did have reason to suspect that. Well, the timeline is something that that can be taken into account in the mix of factors. But for all of the other reasons that I've said, I mean, to say it in a in a in a blunt way, the government views Mr Lee's comments on these recordings as extremely incriminating on their centerpiece of the government's case. For that reason, they're not the kinds of things that you would expect someone to say if they were being very careful with their words because they did suspect that they were being recorded. And so that's why it's so important for the jury to have received the full picture of what Mr Lee was saying. And when he asks an apparent it's framed as a question, and then the context shows it's also intended inquisitively. Okay. What about harmless error? Well, it's it's not harmless error because of the way the government used these recordings on that goes from the opening statement through the closing arguments all the way through to the government's rebuttal. In this case, the opening statement highlighted the recorded drop in the ocean remark from these recordings in the conversations with Justin Kim. The closing argument focused on the other exhibits taken from this recording without acknowledging the questions that Mr Lee asked on Exhibit 118 A. And the government emphasized Mr Lee's quote words. His own words, ladies and gentlemen, show that the defendants knew exactly where that money went, who it was intended for. Jose Weezer ended the quote. Now that is the exact point that these questions, if intended inquisitively, show that he didn't know. It goes to the heart of why the government argued Mr Lee was guilty, and it continues into the rebuttal where the defense is faulted for leaving out context from from these recordings. Were the photos that appear at SCR 248, 249 and 250 admitted into the record? These are the photos of the cash with the handwritten notes. Were those admitted? I believe they were, Your Honor. Okay. In Cruz Garcia, the government's heavy reliance on a theory that would have been undermined by excluded evidence made the error not harmless. Same situation here. If I may return to a couple facets of the of the speech issue, I would like to explain in some detail why I believe that the error was preserved and referring to the first sentence of Rule 51 B, the defense satisfied. I see that I have three minutes left on the clock, so I'll take I'll just quickly touch on this. A party may preserve a claim of error by informing the court of the action the party wishes the court to take, and that is what the defense counsel did by explaining that the ban should not be imposed. But even and similarly under Pajaros Galan, waiver or forfeiture is argued at the level excuse me, is analyzed at the level of claims, not arguments. The hasty ruling here precluded the opportunity to specify the First Amendment grounds, which recalls the fact pattern from Mancini's Flores, where a hasty ruling and then calling in the jury precluded an opportunity for the defense to specify all grounds why that plea should have been accepted. And I'll reserve the remainder of my time for rebuttal. All right, counsel. Thank you. We'll hear from the government. Thank you, Your Honors. May it please the court. Cassie Palmer on behalf of the United States. This court should affirm the convictions and David Lee's sentence. In this case, I will start with the First Amendment issue. The court was not on notice of a First Amendment issue. Defense counsel in raising this issue with the court and the government did raise it. And that's because soon before the jury was coming in, the court informed counsel that the jury was being assembled, and he was talking to counsel about various issues relating to voir dire. One member of the team asked the defense, Are you going to be doing social media research? And as the court noted, there had been several hearings about the procedures. This was during COVID, and this had not been raised at any time. Defense counsel said that they did plan to do that. And so the government raised it with the court and specifically what the government said is that we oppose it. But to the extent that the court is going to allow it, it should allow it for both sides. When you said this was happening during COVID, were people assembling in the courtroom? People... The jury assembly was down below, and the court said they would be bringing the jury actually. But they were physically present. The jury was not physically present. They were in a jury assembly room downstairs. They were physically present. They're in the courthouse. They were in the... Oh, I'm sorry. Yes. Okay. You've answered my question. That's okay. They were physically present in the courthouse, not in the courtroom. Got it. And so... Can we talk about the hearsay exceptions and the recorded conversations? Yes, Your Honor. I'm happy to do that. Your position is that these statements weren't really questions, that they were exculpatory, and it wasn't gonna be subject to cross examination, right? Yes. And Your Honor, focused on exactly what the district court considered very relevant, which was the chronology. And I would just like to bring that into focus. Would you please? That would be helpful. Yes. The chronology of when these conversations took place was after search warrants had been issued in November of 2018. It was after a conversation between Jose Huizar and Justin Kim, where Jose Huizar... This was in October of 2018, where Jose Huizar told him, Georgia Spars is still holding on to the money. I don't have it yet. And Justin Kim testified he then had told David Lee that. Then we come to March 2019. On March 5th, 2019, Justin Kim is served for a search warrant for his phone. He retains an attorney and he has a conversation with David Lee. That's an unrecorded conversation on March 10th, 2019. He tells David Lee, I got an attorney, the government took my phone and I told the attorney the truth. David Lee is upset with him. He tells him he shouldn't have done that. He instructs him to fire his attorney so they can match their stories. To get a new attorney? To get a new attorney. After that... Did Lee get a new phone? Lee also got a new phone. Okay. Yes. And Justin Kim testified that he got a new phone because the government had taken his phone and David Lee got a new phone at that point. Then, two days after that conversation, the government serves a subpoena on David Lee for 940 Hills documents. That is when this conversation takes place. And in between... The conversation was after the subpoena was served. It was after the subpoena was served. It was after the initial conversation where David Lee said they needed to match their stories and that Justin Kim should fire his lawyer and that he was specifically angry with Justin Kim about the amount of the bribe that he had disclosed to his attorney. David Lee also, right before this meeting, it's the first time that he instructs an employee to start creating these false records. That's on March 18th. So this March 20th conversation takes place and in it... That's the restaurant. Now we're in the restaurant? Yes, this is the restaurant. And in this, the district court was well within his discretion in determining that David Lee is attempting to come up with a plausible cover story. And that's why the chronology is quite important. The court also needs to consider that these transcripts were presented in full. The defense is focusing here on a few questions in those transcripts. One is two pages, one is three pages. There's a lot of text. There's a lot of information that is plainly hearsay. Justin Kim will talk for half of a page in one of the transcripts. That's what was presented to the district court for admission, not just those few questions. How was it presented to the jury? Which part, Your Honor? Well, that's what I'm trying to get at. You've said they were presented in full. You mean to the court? I'm saying when the defense sought admission, they didn't only seek admission of the questions that they're sort of focusing on in the appeal. They sought admission of these full two and three page transcripts, which were much longer and had lots of back and forth, including Justin Kim asking questions and David Lee answering, David Lee asking questions and Justin Kim answering, and then them just talking and making assertions all over the place. So the questions are actually quite a small part of those transcripts overall. Okay, but you have lost me because now you're suggesting that the... I don't think you mean to say that the entirety of the transcript was... That the government sought to admit the entire transcript. I'm saying the defense sought to admit the entirety of these two transcripts that they're challenging on appeal. And those transcripts in... But what did the jury hear? It's 118A and 118B. I understand that. Can you just tell me how were the portions that were submitted to the jury presented to the jury? They were read into the record. Right. And by whom? They were read into the record by a different person. So during trial, they came in during Agent Savetti's testimony, portions of them, and so they were read by AUSAs. And then Justin Kim, during his testimony, read his portion into the record and an AUSA read the other portion. Okay. And the defense, of course, is invoking the rule of completeness as well as hearsay, and they wanted more, perhaps all of the transcripts to be read, correct? Did the jury know that the conversation took place in Korean, I think, and it had to be translated? They did know. They were provided the jury instruction that these were originally in Korean, they were translated, and they were to only consider the English language transcript. So they weren't... The jury didn't hear it audibly? Correct. Okay. That's correct, Your Honor. And so given that context of chronologically when this is happening, and also the context of what the district court was considering, what defense was actually trying to admit was longer portions than the few questions that they're focusing on. The district court certainly did not abuse its discretion, and in any case, the error would be harmless. The defense focused in their argument on the drop in an ocean comment, but there were similar comments like that that the defendant made in the excluded transcripts, that Huizar probably did tens and hundreds, which is a very similar comment. So if there was an error, it certainly would be harmless. Does the court have any other questions about that? Well, not about... I guess... I have a question about, and I asked opposing counsel about the photos at SCR 248 through 250. This is the photo of the cache with the handwritten notes. Those were admitted, Your Honor. Right. And so my question is, were those admitted before or after the transcripts that we were just discussing? Do you remember? I believe that those were admitted during George Esparza's testimony, so they would have been both before and after, because Agent Civetti testified to some of the transcripts, then George Esparza testified, and Justin Kim testified later in the trial. Okay. Thank you. Would the court like to hear argument on the First Amendment issue or... Not from... On my account, I'm interested... I guess, I suppose your friend raised the question, does the government have a uniform position on the use of social media searches for jurors? It seems to have taken different positions in different places. I think that there is not a uniform position. It sort of matters with respect to the publicity in the case and other issues. Also, we hadn't had a chance to sort of look into this issue, discuss it as a team. It really was a surprise. It was a curveball that was created by the defense. It was not created by the government. Which way does the publicity in the case cut? The publicity in the case would cut against social media research, Your Honor. And that sort of goes along with the line of cases that... Which is separate from the First Amendment, but under the Sixth Amendment, the right to a public trial, anonymous juries. Courts have found that where there's publicity at issue in order to protect jurors, make them feel safe and secure in making their decision without the outside eyes prying in, without thinking that by becoming jurors, they're relinquishing all of their privacy rights, that would actually be in favor of not allowing it. You move on to the Official Act issue and how this squares with the McDonnell and... Certainly, Your Honor. The instructions here properly defined Official Act, and actually, it's completely consistent with McDonnell. Defense doesn't actually argue otherwise. The instructions specifically quotes from McDonnell. It says that any decision or action on a matter, cause or suit proceeding, or controversy involving the formal exercise of power. It also properly identified what is not an Official Act, which is merely arranging a meeting, hosting an event, or giving a speech. That would not be sufficient. And it properly identified the matter that was pending, which was the Crete L.A. Appeal. And so the formal exercise of power was the request of a private party to drop their appeal. The formal exercise of power was the vote. And an important... Was what? Was the vote. Agreeing to vote against the project. Agreeing to vote against the project or leveraging the vote against the project in order to reach the same result, which is getting the appeal dismissed. The important thing to think about here and that McDonnell has focused on, and that in the related case, Shenzhen, the court focused on, which is you're looking at the bribe giver's intent. And as soon as a payer of a bribe gives or offers a payment in exchange for an Official Act, that's enough. He doesn't have to say how that's going to be accomplished. And actually, the official doesn't have to say how that's going to be accomplished. This matter was pending before the city, and Jose Huizar would have a vote both in Plum and City Council. And so being able to use his vote to actually vote against it or to telegraph his vote in order to reach the same result, that is an official act. And in McDonnell, the court said it didn't want to usually... In determining what is a quo, it shouldn't be fully categorical. It's up to the jury, under the facts of the case, to determine whether the public official agreed to perform an Official Act at the time of the alleged quid pro quo. Is that a matter of degree? I guess we think in McDonnell and some of the court's concerns there, I guess you could say the Official Act is that at some point, the governor could fire or demote someone if they didn't hold the meeting, if they didn't do the unofficial act that was being acted upon. How do we distinguish that? Yes, he could take the vote, but the direct act here is pressuring the group. Because it's still... The nexus of that is still the vote. He can't exert that pressure without telegraphing as he did. I'm going to vote against you. But a governor can telegraph, can exercise that pressure because in McDonnell, all these questions were being arranged with subordinates, people over whom the governor had power, but the court said, no, that's not an official act. That's different because here, there was actually a matter pending in front of him. So this is a matter that... Are you referring to the plum committees, the proposal for the plum... What are you referring to exactly? The appeal. The union's appeal was pending. It was a matter that was going to go through the commission, and it was going to come in front of Jose Wieser on his desk. It's not unlike if a judge had a law... And wasn't there more than that? So you're kind of saying two things, that one... And I just wanna be very clear on this. I think you might be heard to be arguing that the Official Act was agreeing to pressure the union to withdraw their appeal, and you might have said a minute ago that the Official Act was promising to vote against it. It's both. It's using the vote both ways. Both of those require him to have a vote, and it gives him power over... It gives him official power over the litigants. So imagine a judge has litigants... I don't understand what you mean when you say using the vote both ways. He wouldn't vote, presumably, if the appeals was drawn. So I don't know what you mean. Wouldn't vote. He doesn't have to vote. He was able to pressure by saying, I'm going to vote against... Is your response that the Official Act is exerting pressure, or is your response that the Official Act was promising to vote against it? Well, first, he doesn't have to say how he's doing it. I'm just asking for your theory. What he actually did is both things. He said either way, and that's also in the notes, and as far as it's notes... That's a direct answer. I'll take it. Thank you. Okay. Thank you. And I would also note that in McDonald, it said that an action eliminating something, a qualifying step before it actually gets to an other Official Act, would qualify as an Official Act, and that is important here. Did Your Honor have any other questions with respect to that? No. Thank you. Were there any other questions? Appears not. Okay. Thank you. On that, I would submit. Thank you very much, Your Honors. Thank you, counsel. Rebuttal. Thank you, Your Honor. Two points each on the First Amendment issue and the hearsay slash completeness issue. Number one, even if unpreserved, de novo review should apply to the First Amendment issue because it is a question of pure First Amendment law because there were no facts proffered by the government or cited by the district court in its opinion. And that leads me to my second point related to the First Amendment issue, which is that there was absolutely no requirement for the defense to give notice to the government or the district court that it was gonna do this research, which is extremely commonly done research. Virtually any trial team with the resources would do this research, just as pointed out in the government's brief in the D.C. Trump case. It's vital to jury selection. Proceeding to the hearsay slash completeness portion of argument, it's true that admission of those statements would not have allowed cross examination of the defendant, but that's always true anytime it's a defendant's out of court statement. And it's, of course, not the rule of law that a defendant's out of court statements can never be admitted. It's not a special hearsay rule applicable to criminal defendants. And the other point related to the timing, which I understand is a concern for the court, that would, of course, have to be balanced with the evidence that's on the recordings themselves. I would submit that the timing type of evidence is more attenuated than Justin Kim's live responses on the recording to the questions as he heard them. And if it was a tie, the tie goes to the defendant, because the government had the burden to show assertive intent in the questions. And so, in conclusion, the right to receive information is fundamental to our society, and I hope the court will strongly consider remanding because of the unconsidered violation of that right in the district court. Thank you. Thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for a decision by the court. This completes our calendar for the day and for the week. We are adjourned. All rise. This court for this session stands adjourned.
judges: RAWLINSON, CHRISTEN, JOHNSTONE